Nott, J.,
delivered the opinion of the court:
The claims which form the causes of action in this case were transmitted to this court by the Committee on Military Affairs of the House of Representatives. The first is for having originated and brought to the attention- of the government the strategic design which was begun by the armies of the United States on the Tennessee River in the winter of 1861-’62. The second is for literary services rendered to the government, at the request of the War Department, at various times during the years 1861-’62.
*427 1. It is alleged by tbe claimant that during the autumn of 1861 she proceeded from Washington to Saint Louis for the purpose of acquiring military information, for the use of the government, directly or indirectly connected with the advance down the Mississippi. In the progress of investigation she acquired information which suggested the idea of our armies advancing southward by ascending the Tennessee. Further inquiries, convinced her of the feasibility and superiority of that line, and her views she embodied in a paper addressed to Hon. Thomas A. Scott, Assistant Secretary of War, dated November 30, 1861, a paper remarkable as being the work of a civilian, and still more remarkable as being the work of a woman.
It was in these terms:
“November 30, 1861.
“ The civil and military authorities seem to be laboring under a great mistake in regard to the true key of the war in the Southwest. It is not the Mississippi, but the Tennessee River. All the military preparations made in the West indicate that the Mississippi River is the point to which the authorities are directing their attention. On that river many battles must be fought, and heavy risks incurred, before any impression can be made on the enemy, all of which could be avoided by using the Tennessee River. This river is navigable for medium-class boats to the foot of the Muscle Shoals, in Alabama, and is open to navigation all the year, while the distance is but two hundred and fifty miles by the river from Paducah, on the Oliio.
“ The Tennessee offers many advantages over the Mississippi. We should avoid the almost impregnable batteries of the enemy, which cannot be taken without great danger and great risk of life to our forces, from the fact that our boats, if crippled, would fall a prey to the enemy by being swept by the current to him and away from the relief of our friends. But even should we succeed, still we will only have begun the war, for we shall then have to fight to the country from whence the enemy derives his supplies.
“ Now, an advance up the Tennessee River would avoid this danger; for if our boats were crippled, they would drop back with the current and escape capture.
“But a still greater advantage would be its tendency to cut the enemy’s line in two, by reaching the Memphis and Charleston Railroad, threatening Memphis, which lies one hundred miles due west, and no defensible point between; also Nashville, only ninety miles northeast, and Florence and Tuscumbia,. in North Alabama, forty miles east. A movement in this di *428 rection would do more to relieve our friends in Kentucky and inspire the loyal hearts in East Tennessee than the possession of the whole of the Mississippi Eiver.
“ If well executed, it would cause the evacuation of all the formidable fortifications on which the rebels ground their hopes for success; and in the event of our fleet attacking Mobile, the presence of our troops in the northern part of Alabama would be material aid to the fleet.
“Again, the aid our force would receive from the loyal men-in Tennessee would enable them soon to crush the last traitor in that region, and the separation of the two extremes would do more than one hundred battles for the Union cause.
“ The Tennessee Eiver is crossed by the Memphis and Louisville Eailroad and the Memphis and Nashville Eailroad. At Hamburg the river makes tne big bend on the east, touching the northeast corner of Mississippi, entering the northwest corner of Alabama, forming an arc to the south, entering the State of Tennessee at the northeast corner of Alabama, and if it does not touch the northwest corner of Georgia, comes very near it. It is but eight miles from Hamburg to the Memphis and Charleston Eailroad, which goes through Tuseumbia, only two miles from the river, which it crosses at Decatur, thirty miles above, intersecting with the Nashville and Chattanooga road at Stephenson.
“ The Tennessee Eiver has never less than 3 feet to Hamburg on the “shoalest” bar, and during the fall, winter, and spring months there is always water for the largest boats that are used on the Mississippi River.
“It follows from the above' facts that in making the Mississippi the key to the war in the West, or rather in overlooking the Tennessee Eiver, the subject is not understood by the superiors in command.”
The documents which the claimant offers as evidence indicate that this communication was received and favorably considered by the Assistant Secretary, but it does not appear that it was acted upon by the government. It may be true, as the claimant alleges, that she was the first to conceive this idea, the first to enunciate it, the first to bring it to the attention of the government; and it may be and unquestionably is true that the strategic movement described in her letter was subsequently accomplished; and yet it may likewise be true that the plan thus successfully carried out originated with the military officers of the United States as well as with Miss Carroll, and, so far as the government is involved, was substantially their plan and not hers.
*429 It is not to be supposed that Congress will compensate a citizen for a patriotic idea or earnest thought; all patriotic citizens owe that much to their country without remuneration.
But if Miss Carroll expended time and money in her attempt to serve the country, and formulated a military plan which possessed military value, and if that plan was accepted and acted upon, then, on ordinary accepted principles of law, the government might well be deemed indebted to Miss Carroll for the reasonable value of her services.
As has been said, the plan seems to have been brought to the attention of the War Department, and to have been favorably considered by several persons in authority. But there is nothing to show that the President or the War Department ever transmitted it to General Halleck or General Grant, or issued orders from which its acceptance might be inferred. Until that fact be shown (for it is certainly susceptible of proof) no court would be authorized in deciding that the strategy was not original with the military authorities who apparently planned that advance, and who were morally and officially responsible for its success.
2. The second claim is for literary services. It is alleged by the claimant that she wrote and published several pamphlets, during the years 1861 ’62, at the request of the War Department. These publications have not been brought before the •court, ind the court cannot judge either of their ability or extent. The sum of $1,250 was paid her by the War Department, but the payment was intended, so it is alleged, to reimburse her for her expenses in publishing, and not to compensate her for her literary services. If this claim were fortified by competent evidence, the court would probably be able to fix the amount she is equitably entitled to recover. But, unfortunately, the documents relied upon, while they may morally satisfy the judgment of the individual, are not evidence which ■can be received or considered by a court. As individuals the members of this court may feel morally certain that the Assistant Secretary of War employed Miss Carroll to write and publish pamphlets, and they may feel morally certain that Mr. Scott gave the following certificates, and they may believe a ■certificate of that gentleman as implicitly as they would his testimony given under the obligation of an oath; and un *430 doubtedly every member of this bench does give as absolute credence to the certificates of such illustrious members of this bar as Eeverdy Johnson and Charles O’Conor as if they were fortified by the oaths of a hundred witnesses. But as a court we must pronounce these certificates as valueless as blank paper,, and hold that they establish no judicial fact.
The following are the certificates referred to:

u Secret-service fund of the War Department to Anna Rila üarroll. Dr., as per agreement with Ron. Thomas A. Scott, Assistant Secretary of War.

1861.
Sept. 25, To circulating the Breckinridge reply. ¡¡¡1,250
Dec. 24. To writing, publishing, and circulating the “ War Powers,” &c..■. 3,000
1862.
May —■. Writing, publishing, and circulating the Relations of the National Government to the Rebelled Citizens”. 2, 000*
6,250'
Credit, October 2, 1861:
By cash. 1,250
5, OOO
“ Philadelphia, January 2, 1863.
“ I believe Miss Carroll has earned fairly, and should be paid, the compensation she has charged above.
“Thos. A. Scott.”
“ All my interviews with Miss Carroll were in my official capacity as Assistant Secretary of War, and in that capacity I would, have allowed, and believed she should be paid, the amount of her bill within, which is certified as being reasonable by many of the leading men of the country.
“Thos. A. Scott.
“Philadelphia, January 28, 1863.”
“ The pamphlets published by Miss Carroll were published upon a general understanding made by me with her, as Assistant Secretary of War, under no special authority in the premises, but under a general authority then exercised by me in the discharge of public duties as Assistant Secretary of War. I then thought them of value to the service, and still believe they were of great value to the government. I brought the matter generally to the knowledge of General Cameron, then Secretary of War, without his having special knowledge of the whole matter; he made no objections thereto. No price was fixed, but it was understood that the government would treat *431 her with sufficient liberality to compensate her for any service she might render, and I believe she acted upon the expectation that she would be paid by the government.
“ Thomas A. Scott.
“ Philadelphia, January 28, 1863.”
“ Without intending to express any assent or dissent to the positions therein asserted, but merely with a view of forming a judgment in respect to their merits as argumentative compositions, I have carefully perused Miss Carroll’s pamphlets mentioned in the within account. The propositions are clearly stated, the authorities relied on are judiciously selected, and the reasoning is natural, direct, and well sustained, and framed in a manner extremely well adapted to win the reader’s assent, and thus to obtain the object in view. I consider the charges quite moderate.
“ Charles O’Conor.
“New York, October 10,1862.”
“Without having seen the writings mentioned in the within account, I have heard them so favorably spoken of by the most, competent judges that the charges of the account seem to be most reasonable.
“Reverdy Johnson.
“Washing-ton, September 19,1862.”
The counsel for the claimant has urged the court to take up the reports of several committees of Congress and adopt the facts reported as a judicial finding of facts in this case. But the court is of the opinion that the purpose of the Bowman Act was not to dispense with legal evidence, but to acquire it; and that when a claim is transmitted by a committee of Congress under the act the purpose is to secure the judicial ascertainment of facts by judicial means, namely, by that which the law defines to be competent evidence. The legislative branch of the government is not thus circumscribed; its members may act upon moral conviction, and to Congress we must retransmit the claim.
The order of the court is that, no findings of fact being established by the evidence in this case, this opinion be transmitted in-lieu thereof to the Committee on Military Affairs of the House of Representatives.
Davis, J., did not sit in this case and took no* part in the decision.